## W. Q. WRIGHT, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4270.   Promulgated February 16, 1928.

*Leon de Fremery, Esq., Rufus H. Kimball, Esq.,* and *Anson Herrick, C. P. A.,* for the petitioner.

*D. D. Shepard, Esq.,* and *G. E. Adams, Esq.,* for the respondent.

808

810

816

OPINION.

MORRIS: The first allegation of error urged by the petitioner is that the respondent erred in adding to the net income of the petitioner for the years in controversy certain amounts representing alleged cash dividends. The petitioner contends that the dividends received by him were stock and not cash and therefore did not constitute income within the meaning of the Sixteenth Amendment of the Constitution as defined by the United States Supreme Court in *Eisner* v. *Macomber*, 252 U. S. 189. Cf. *United States* v. *Mellon*, 279 Fed. 910, aff'd. 281 Fed. 645, and *United States* v. *Davison*, 1 Fed. (2d) 465, affirmed 9 Fed. (2d) 1022, certiorari denied 271 U. S. 670. The respondent on the other hand contends that the dividends in question were cash dividends and therefore taxable for the years in question within the meaning of the taxing statutes.

The petitioner owned approximately 50 per cent of the outstanding stock of the Jersey Island Farm Co., referred to herein as the Company, and in effect represented a further 25 per cent. The Company owned substantially all of what is known as Jersey Island and was engaged in farming. The stock had always been closely held by the petitioner or his relatives, who in March, 1919, owned or controlled 49,990 shares of the 50,000 shares outstanding. The petitioner was also president of the Bay & River Dredging Co., and he, through his stock ownership and through the stock owned by his mother, represented practically 100 per cent of the total outstanding capital stock.

The company owned certain reclamation works in 1912 which it sold to Reclamation District No. 830 for $300,000, which sum was paid by bonds of that district. In 1917 when the bonds were taken up in the books of the Company, the entry was made in the amount of $270,000 since a portion of the bonds had already been redeemed.

By resolution of the board of directors of the Company the capital stock was increased in 1919 from $50,000 to $500,000, $1 par value, to be sold to each stockholder " either in cash or a duly executed promissory note " at 55 cents per share for each share purchased. The purpose of the increase of the capital stock was to capitalize the difference between the amount invested in the Company by the stockholders plus its surplus, and the value of the land owned by the Company. The authorized capital stock of the Company having been increased, it issued 249,800 shares to the petitioner, 125,100 shares to F. A. Quinby, uncle of the petitioner, 10 shares to Myra E. Wright, mother of the petitioner, and 124,980

shares to the Bay & River Dredging Co., which Company, as has been stated, the petitioner actually controlled, making a total of 499,890 shares out of a total authorized issue of 500,000 shares. Upon the issuance of the increased stock the Company took notes in payment thereof in the total amount of $247,500, which sum was charged to bills receivable and a corresponding credit was made to capital stock in the books of account of the Company. It was agreed among the petitioners at the time that these notes were not to be paid but were to be canceled upon the declaration of certain future dividends.

The reclamation district was organized under the laws of the State of California and is a political subdivision of the State, depending entirely upon the assessments which it is authorized to make against the property owners within its district. In 1919 and 1920 the district levied three assessments against the Company, aggregating in amount $283,910. These assessments were paid, in the final analysis, by the cancellation of bonds of the district which the Company held.

As the bonds of the district were redeemed by payment of the several assessments levied against the Company, the so-called " assessment reserve," which had been set aside in the books of account as a result of the sale of the reclamation works to the district in 1912, was made available for the dividends which were declared in 1919 and 1920. As the assessments were made in 1919 and 1920, dividends were declared aggregating in amount $285,600. Upon the declaration of each dividend the assessment reserve was charged and dividends credited for the amount of the dividend declared.

The petitioner, believing that the dividends in question were nontaxable, did not report them in his income-tax return for the years 1919 and 1920.

If the dividends in question are cash dividends as distinguished from stock dividends, the amounts thereof, to the extent of earnings accumulated subsequent to March 1, 1913, are taxable to the petitioner; if not, they are not taxable.

In *United States* v. *Mellon, supra,* decided by the District Court, Western District of Pennsylvania, later affirmed by the Circuit Court of Appeals, Third Circuit, the court, having under consideration facts resembling those in the instant case, held that the amounts received by the defendant upon which the plaintiff proposed to assess a tax constituted stock dividends and therefore were not taxable within the meaning of the taxing statutes. In that case the defendant owned certain shares of stock of the Gulf Oil Corporation, which corporation, while its earnings had been large, had never declared a dividend, nor had it been in such a financial position that it would have been justified in declaring a dividend, for

the reason that all its earnings had been utilized for extension and developmental purposes. That corporation on December 31, 1912, had an outstanding capitalization of $11,280,200, and its indebtedness was around $15,000,000, of which $2,750,000 were in accounts payable and $4,750,000 in bills payable. That corporation had quick assets of $12,500,000, which amount included some $600,000 of cash. It was agreed that that corporation should increase its capital stock to $60,000,000 and that out of the increase an amount equal to 100 per cent of the then outstanding stock, namely, $11,280,200, was to be sold at par for cash in order to provide the corporation with the funds needed to pay existing debts, and to carry on its business. The stockholders, as an inducement to purchase these further shares, were to receive a 100 per cent dividend, the same to be accepted by them in stock. In order to insure success of the plan agreed upon, the directors of that corporation, including the defendant in that case, agreed in advance to accept and pay for their proportionate amount of stock, and at the same time A. W. Mellon and R. B. Mellon, who were large stockholders and who had endorsed the outstanding paper of that corporation agreed that, in case any stockholders should decline to take payment of said dividend in shares of stock or fail to subscribe for their share of the additional 100 per cent of stock to be sold, they would take and pay the corporation therefor. The principal stockholders accepted payment of said dividend in stock of the corporation, but the holders of a small number of shares received cash. The court found in that case as a fact, that at the time of the declaration of said dividend and payment thereof, the corporation did not have cash with which to pay the same " or any substantial part thereof." The language of the District Court in summarizing the result of that transaction is as follows:

After the transaction, the defendant had two shares to represent the interest in the same property which prior thereto was represented by one. After the transaction, there were twice as many shares of the corporation in the hands of the stockholders as there were before. The corporate assets had not been diminished by the transaction. Therefore, for two shares which defendant possessed at the close, there was for him the same value as for one share represented at the beginning.

The District Court said in its discussions:

It is clear, that, if the resolution declaring the dividend in question, had provided for the payment of the dividend in stock, the dividend would not have been taxable. It is also clear that the defendant received payment of the dividend in shares of stock, and that he did this pursuant to an agreement made prior to the declaration of the dividend, which agreement was communicated to the corporation before that declaration was made.

The Court said further, "In every view of the transaction, we find that its substance is clear. In cases like the present, substance is controlling, and not form."

In considering the instant case we should carefully examine the facts as they existed, not only in the taxable years in question but prior thereto; we should weigh the understanding and agreements had between the stockholders and directors of the Company and consider the financial status or the financial ability of the Company to pay in cash the amounts of dividends which were declared in the years 1919 and 1920. In other words, we must pierce the veil of form and look to the substance of the transaction in question. *Bailey* v. *Railroad*, 106 U. S. 109; *Lynch* v. *Turrish*, 247 U. S. 221; *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330; *Gulf Oil Corporation* v. *Lewellyn*, 248 U. S. 71; *Eisner* v. *Macomber*, 252 U. S. 189; *United States* v. *Phellis*, 257 U. S. 156; and *Weiss* v. *Stearn*, 265 U. S. 242.

As set out in the minutes of the meeting of the board of directors held on March 29, 1919, the amount invested in the Company by the stockholders was approximately $252,500 and the value of the property owned by the Company was $500,000, and it was to capitalize the difference of $247,500 that the capital structure was increased. It was thought that the amount of $270,000 carried on the books as "assessment reserve" was not immediately available as surplus, and that during the interim until the payment of the bonds it was necessary to have the notes. It was understood, however, that the makers of the notes were not to pay the same. They were regarded as purely a "*pro forma* matter" pending the redemption of the bonds. The increase in capital stock was charged to surplus to the extent that it was thought available when the stock was increased. The remainder was charged to "bills receivable," it being understood by the stockholders that as the surplus became available, surplus would be charged and bills receivable credited until the entire increase in capital stock had been charged to surplus. No dividend checks were drawn by the Company for the dividends in question, nor was any payment made by the Company of any of the dividends or any portion thereof to any of the stockholders, either in cash or by endorsement on any promissory note. Furthermore, as each of the dividends in question was declared, notwithstanding the language used in the minutes of the meetings of the board, it had already been agreed that the dividends should never be paid in cash, nor did any of the stockholders make demand upon the Company for the payment thereof.

Examining the financial ability of the Company to meet these obligations in cash, we find that it had in its balance sheet at December 31, 1918, quick assets in a round amount of $32,400, including $72.40 in cash. The Company's current liabilities, as disclosed by

the balance sheet above referred to, amounted to many times the current assets of the Company available for dividends at December 31, 1918. The average monthly cash balance during 1919 was in the neighborhood of $1,800 and in 1920 it was in the neighborhood of $1,200. The balance sheet of December 31, 1919, discloses Liberty bonds of $20,000 and cash of $534.68. It also includes bills receivable, the nature of which we are not informed, and the bonds of the reclamation district. Certainly the current assets which were readily realizable were negligible as compared with the amount of dividends declared, particularly when we review the liabilities as they appeared in the balance sheet of December 31, 1919, which were largely in excess of any amounts, under the broadest interpretation, that could be turned into cash within a reasonable time. After a consideration of these facts, we are led to the conclusion that the Company was not at any time during the years involved financially able to pay these dividends in cash. It may be argued, of course, that the directors of the Company contemplated borrowing money, but the facts and circumstances surrounding the declaration of these dividends clearly rebut any presumption that may arise in this connection. In fact we seriously doubt the ability of the Company to borrow on its assets any large sums of money to be used in paying dividends.

In *Appeal of Theresa Zellerbach*, 2 B. T. A. 1076, the question presented for the consideration of this Board was whether certain dividends, declared to the taxpayers by a corporation in which they were stockholders, constituted income within the meaning of the law. In that case the Board said (p. 1083):

If we were to rely upon the records of the company as contained in the minute books alone we would of necessity be compelled to sustain the Commissioner.

It may not be inappropriate at this juncture to add that if we were in the instant case relying solely upon the wording of the minutes of the board of directors, we would be compelled to sustain the views of the respondent. In that case, however, we said, " we must have regard for the very truth of the matter and look to substance rather than form to reach a conclusion as to the merits of the taxpayers' contentions." In that case it appears that the holders of 92 per cent of the stock had agreed upon the plan of dividend and knew that they would pay no money for the stock issued to them, nor would they receive any money from the dividend declared. In the instant case the stockholders who owned or controlled 99 per cent of the stock of the Company had agreed and thoroughly understood that the notes which they gave in payment of their stock would never be called for payment in cash, and furthermore, that the dividends ultimately to be declared would never be paid to them in cash. In that case the Board said (p. 1084):

Nothing was given to the stockholders which they had not theretofore had. The company still had the $750,000 and the stockholders merely had an increase in the number of pieces of paper, which represented the same proportionate interest in the property of the corporation that their original holdings did.

In the instant case the petitioner received no cash but merely received in exchange for each share of his stock, ten shares of the new capitalization; he had received nothing more nor less than a further division of his interest in the assets of the Company which he owned prior to the increase in its capital.

The respondent relies, *inter alia*, upon *Appeal of W. J. Hunt*, 5 B. T. A. 356, in which the Board held that the dividends therein under consideration were cash and therefore taxable to the recipient. In that case the Board said (p. 358) :

Whether, in any case, a dividend is a stock or cash dividend is a question of fact and the question must be decided upon the peculiar facts in each case.

In that case, unlike the facts in the instant case, there was a segregation of the profits of the corporation and the corporation issued its check to the stockholders for their proportionate share of the corporate earnings. Each stockholder endorsed the check which he had received and turned it back to the corporation and it was deposited to the stockholder's credit, whereupon checks given by the stockholders for stock were presented and paid. We are of the opinion that the facts and circumstances in *Appeal of W. J. Hunt, supra*, are clearly distinguishable from the facts and circumstances in the instant case.

Having carefully reviewed the facts and circumstances of this case, and convinced as we are that the dividends here in question were intended to be paid in stock instead of cash, and considering the fact that no cash was ever paid to the stockholders, we can not escape the conclusion that the amounts in question constituted stock dividends, and, therefore, under the decided cases, are not taxable income within the meaning of the statute.

Having so concluded with respect to the first issue herein it becomes unnecessary for us to give any consideration to the second issue raised by the petitioner.

Reviewed by the Board.

*Judgment will be entered for the petitioner on 20 days' notice, under Rule 50.*

SMITH did not participate.

TRAMMELL and PHILLIPS dissent.