UNITED STATES, by LEWELLYN, Collector of Internal Revenue, v. MELLON.*

(District Court, W. D. Pennsylvania.   May Term, 1919.)

No. 2126.

1. **Internal revenue 7—Substance, not form, determines whether dividend is income.**

   In determining whether a dividend declared by a corporation is taxable income of the stockholder, or is merely a stock dividend, which is not taxable, the substance, and not the form, of the transaction governs.

2. **Internal revenue 7—Dividend declared in cash, under previous agreement stock was to be taken, is stock dividend, not income.**

   Where a corporation, which had earned large sums, but had expended its profits in enlarging its plant, voted a dividend of 100 per cent., which it did not have the cash to pay, relying on an agreement previously made with its principal stockholders that they would subscribe for additional stock to the amount of their dividend, and would also take and pay for in cash the stock allotted to smaller stockholders who elected to take their dividend in cash, the dividend to one of the stockholders, who subscribed for the additional stock, was in substance a stock dividend, and not a cash dividend, which did not increase his assets, and which was therefore not taxable as income.

At Law.   Action by the United States, by C. G. Lewellyn, Collector of Internal Revenue, against William Larimer Mellon.   Judgment directed for defendant.

Walter Lyon, U. S. Atty., B. B. McGinnis, Sp. Asst. U. S. Atty., and Warren H. Van Kirk, U. S. Atty., all of Pittsburgh, Pa.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., for defendant.

ORR, District Judge.   A stipulation was filed in this case, signed by the attorneys for the defendant, containing, among other things, a waiver of trial by jury.   The case, therefore, was tried by the judge. In said stipulation many facts were agreed upon.   To supplement said stipulation, the testimony of several witnesses was taken.   During the taking of the testimony, various objections were made by the attorneys for the plaintiff, all of which, except where now and then a particular question was withdrawn, were overruled, with the intention of the court to grant an exception to each ruling.   Therefore, where the stenographer's minutes fail to show the granting of exceptions in favor of the government, an exception is now allowed.   From the said stipulation and the testimony, the trial judge has found the following:

### Findings of Fact.

(1) This suit is brought under the Act of October 3rd, 1913 (38 Stat. 114), to recover an income tax amounting to $71,301, with interest, claimed to be due from the defendant by reason of the declaration and payment to him by the Gulf Oil Corporation of a dividend of 100 per cent.

(2) The Gulf Oil Corporation (hereafter, for convenience, termed the "Gulf Corporation" or "the corporation"), is a corporation of New Jersey, and was organized and began business in February, 1907.

It is a holding company, and itself carries on no business; but it was organized for the purpose of, and through its subsidiary companies is engaged in, the production, transportation, refining, and marketing of oil. The Gulf Corporation, as so organized, was in fact a reorganization of the Guffey Company and Gulf Refining Company, both organized about 1901, and from that time on having been engaged in Texas in producing, refining, and marketing oil. The purpose was to extend and enlarge the business theretofore carried on by such companies.

(3) The Gulf Corporation immediately extended the pipe line system, so as to reach the newly developed oil fields, first in Oklahoma, and later in Kansas and in other states. Producing properties were acquired and large amounts of oil purchased, and refining capacity was very greatly increased, and the fleet of tank steamers for the transportation of oil from the refinery at Port Arthur, Tex., to ports in the United States and to Europe, was also largely increased.

(4) The business of the Gulf Corporation was carried on entirely through subsidiary companies, principally the following companies, all of the capital stock of which was owned by the Gulf Corporation, namely: J. M. Guffey Petroleum Company, Gulf Pipe Line Company, Gulf Pipe Line Company of Oklahoma, Gulf Refining Company, Indiana Oil & Gas Company, Gypsy Oil Company, and Gulf Commissary Company. The several companies mentioned, together with the other subsidiary companies owned by the Gulf Corporation, constituted a single enterprise, carried on by the Gulf Corporation; that enterprise consisting in a general way of the production and purchase of crude oil, the transportation of oil, and the refining and marketing thereof. The business of producing and purchasing oil was carried on principally in the states of Oklahoma, Louisiana, and Texas, where also oil was gathered and stored, the transportation of oil by pipe lines from points in Oklahoma, Louisiana, and Texas to the Gulf of Mexico, where the refineries were situate, and in which the refined products were manufactured. The marketing of these products was carried on over a large part of the United States and in foreign countries, and for the purpose of shipping such refined products the enterprise owned and operated its own fleet of carrying vessels. The business of the Gulf Oil Corporation, as so carried on, from its organization to December 31, 1912, resulted in large earnings, but substantially all of these earnings were invested, as earned, in the extension and development of the properties and business of the subsidiary companies, and all of such earnings were necessarily required in the conduct of the business so carried on by the Gulf Corporation through its subsidiary companies. Prior to April 15, 1913, no dividends had been paid by the Gulf Corporation to its stockholders.

(5) On December 31, 1912, the Gulf Corporation had outstanding $11,208,200 of capital stock. At the same date, the corporation and its subsidiary companies (excluding all intercompany items) owed $7,231,000 represented by bonds, $4,892,772.19 bills payable for borrowed money, and $2,796,615.15 accounts payable, making a total indebted-

ness of $14,920,387.34. At the same date, the quick assets of the corporation and its subsidiaries aggregated $12,478,819.03, made up of oil $7,661,066.15, supplies $1,311,294.79, receivables $2,876,851.16, and cash $629,606.93. Treating the enterprise as a whole, the net assets of the Gulf Corporation were $23,120,014.24.

(6) At the closing of the accounts as of December 31, 1912, the officers and board of directors of the Gulf Oil Corporation, after careful consideration, found the situation to be substantially this: While the corporation, through its subsidiaries, had, through the period of its history, earned a large amount of money, these earnings were all put back into, and were used in extending, enlarging, and carrying on, the business of the corporation. They were represented largely by fixed assets, such as additions to the oil-producing territory of the corporation; the equipment used in the exploration for and the production of crude oil; in stocks of crude oil and of manufactured oils; extension of pipe lines and gathering lines; tanks for the storage of oil; increased capacity of the refineries of the corporation; the purchase of additional vessels for the transportation of oil and other like matters; and therefore, in the opinion of the directors, the said earnings did not exist in such shape that a dividend thereof payable in cash could be made to the stockholders. In addition thereto, in the judgment of the directors and officers of the corporation, the successful carrying on of the business of the corporation required a large amount of additional capital. While the corporation had been prosperous, it was without sufficient working capital, save as it was able to borrow money for this purpose, which it had been enabled to do by reason of the credit extended to it through its larger stockholders; but, owing to the steadily increasing business done by the corporation, additional capital was required, and in the opinion of its officers and directors the corporation was without credit to obtain such additional capital, save as the same was provided by its stockholders, and some plan of refinancing was necessary.

(7) The chief stockholders of the corporation were Messrs. A. W. Mellon and R. B. Mellon, who together owned 78,584 shares out of a total of 112.082 shares outstanding. In addition to this, the defendant, W. L. Mellon, owned 12,655 shares. Mr. A. W. Mellon had been connected with the enterprise from its inception, and since the organization of the Gulf Corporation had looked after its financing, and was looked to by the other stockholders to formulate the necessary plan for the refinancing of the corporation. After considering the situation, as already set forth, Mr. A. W. Mellon suggested that the refinancing of the corporation be made as follows: The capital stock of the corporation be increased from $15,000,000 to the authorized amount of $60,000,000; that, of such increased stock, an amount equal to 100 per cent of the then outstanding stock, namely, $11,280,200, be sold at par for cash, so as to provide the corporation with the funds required to meet the existing indebtedness and to properly conduct its business; that, for the purpose of inducing or making attractive to the stockholders the subscription to the new shares of stock, a dividend

of 100 per cent. be paid, the same to be accepted by the stockholders in stock. The arrangement as thus outlined was agreed to by A. W. Mellon, R. B. Mellon, W. L. Mellon, the defendant, and by other of the larger stockholders. While the greater part of the capital stock of the corporation was held by a few persons, there was a considerable number of smaller stockholders, the amount owned by them aggregating a large amount of money. It was expected that substantially all of the stockholders would agree to accept payment of such dividend in stock, and would take and pay for their shares of the additional stock to be sold at par. In order to avoid the delay incident to obtaining such agreement in advance, and so that the said plan for refinancing might be proceeded with promptly, Messrs. A. W. Mellon and R. B. Mellon (acting in the name "T. Mellon & Sons") agreed that, to the extent such other stockholders should fail or refuse to take payment of said dividend in shares of stock and should fail to subscribe for their share of the additional 100 per cent. of stock to be issued to provide new capital, they would take and pay for to the corporation all such shares at par. The foregoing arrangement and agreement was made in Pittsburgh, Pa., and was the result of conferences taking place there during the month of January and the early part of February, 1913. At that time the board of directors of the Gulf Corporation consisted of Messrs. W. L. Mellon, the defendant, A. W. Mellon, R. B. Mellon, J. H. Reed, T. H. Given, William Flinn, and E. A. Lyon. The said W. L. Mellon was president and A. W. Mellon vice president of the said corporation.

(8) After the making of the arrangement set forth in paragraph '7), the resolutions as subsequently passed by the board of directors and by the stockholders, and which appear in the record, were prepared by counsel for the purpose of carrying out the arrangement so outlined, and at that time it was the practice, under the law of New Jersey, to accomplish the payment of a stock dividend, either by the payment of such dividend directly in stock, or by the declaration of a dividend equal to the amount of stock to which stockholders were at the same time authorized to subscribe for pro rata.

(9) Before the adoption by the board of directors of the resolutions referred to, the arrangement and agreement, as in paragraph (7) set forth, was communicated to the board of directors at the meetings referred to, and the resolutions as so adopted were passed upon the faith of the agreement on the part of the defendant and other stockholders to take the payment of the dividend in shares of stock and the agreement of Messrs. A. W. and R. B. Mellon to take and pay for any unsubscribed stock, and without such understanding and agreement the said dividend of 100 per cent. could not and would not have been declared.

(10) The defendant and other large stockholders accepted payment of said dividend of 100 per cent. in shares of stock of the corporation out of the increase of stock authorized, and such payment was so accepted by them pursuant to the agreement and understanding hereinbefore set forth, and A. W. and R. B. Mellon took and paid for to the

corporation, at par, for all shares of stock which the stockholders did not subscribe and take.

(11) At the time of the declaration of said dividend, and the payment thereof, the corporation did not have cash with which to pay the same, or any substantial part thereof, and all of the cash which it did have at March 31, 1913, and at April 15, 1913 (with the exception of less than $3,000), was the proceeds of the sale of the newly issued stock. At December 31, 1912, the surplus shown in the profit and loss account of the Gulf Corporation amounted to $541,303.65, and it was only by virtue of the declaration of dividends by its subsidiary companies, aggregating $11,424,400, that the Gulf Corporation had a surplus available for the declaration of said dividend of 100 per cent. At and prior to April 15, 1913, the stock of the Gulf Corporation was not listed upon any public exchange; it had no market value, and very few sales had taken place, and then only in small amounts and between persons connected with the said corporation and its subsidiary companies; and in none of these sales did the price exceed, if, indeed, it reached, par for the stock outstanding prior to the declaration of said 100 per cent. dividend.

(12) The declaration of said dividend was based wholly upon the earnings of the Gulf Oil Corporation, through its subsidiary companies, from the time of its organization to December 31, 1912, hereinbefore referred to.

### Discussion.

The sole question in this case is whether the dividend received by the defendant from the Gulf Oil Corporation in 1913 constituted taxable income within the meaning of the act of Congress. If it be a stock dividend, then the plaintiff cannot recover, for the Supreme Court in Towne v. Eisner, 245 U. S. 424, 38 Sup. Ct. 158, 62 L. Ed. 372, L. R. A. 1918D, 254, has held that a dividend received by the stockholder in shares of stock of the corporation was not income within the meaning of the act of 1913. It is clear that, if the resolution declaring the dividend in question, had provided for the payment of the dividend in stock, the dividend would not have been taxable. It is also clear that the defendant received payment of the dividend in shares of stock, and that he did this pursuant to an agreement made prior to the declaration of the dividend, which agreement was communicated to the corporation before that declaration was made. It is clear that out of 112,080 shares, the holders of all but 1,740 shares actually accepted payment of the dividend in stock, and that the money to pay cash to the holders of said 1,740 shares was provided by T. Mellon & Sons pursuant to an agreement made before the declaration of the dividend, that they would take and pay for any such shares as the holders might refuse to accept as payment therefor. After the transaction, the defendant had two shares to represent the interest in the same property which prior thereto was represented by one. After the transaction, there were twice as many shares of the corporation in the hands of stockholders as there were before. The corporate assets had not been diminished by the transaction. Therefore, for two

shares which defendant possessed at the close, there was for him the same value as for one share represented at the beginning.

[1] It was fair and reasonable that the large stockholders should have regard to the interests of the small investors, who perhaps were more in need of pecuniary returns from their holdings, in that, while giving them an equality of advantage, they provided the means whereby such pecuniary returns would be made to them, not by the corporation itself, but by T. Mellon & Sons, through the medium of the corporation, at a time, too, when the shares of the corporation were not listed upon any public exchange and had no market value. In every view of the transaction, we find that its substance is clear. In cases like the present, substance is controlling, and not form. The courts look through all forms of corporate transactions, and have regard to the substance. Southern Pacific Co. v. Lowe, 247 U. S. 330, 38 Sup. Ct. 540, 62 L. Ed. 1142; Gulf Oil Corporation v. Lewellyn, 248 U. S. 71, 39 Sup. Ct. 35, 63 L. Ed. 133. The majority opinion of the Supreme Court in Eisner v. Macomber, 252 U. S. 189, 211, 40 Sup. Ct. 89, 194 (64 L. Ed. 521, 9 A. L. R. 1570) is helpful:

"A 'stock dividend' shows that the company's accumulated profits have been capitalized, instead of distributed to the stockholders or retained as surplus available for distribution in money or in kind should opportunity offer. Far from being a realization of profits of the stockholder, it tends rather to postpone such realization, in that the fund represented by the new stock has been transferred from surplus to capital, and no longer is available for actual distribution. The essential and controlling fact is that the stockholder has received nothing out of the company's assets for his separate use and benefit; on the contrary, every dollar of his original investment, together with whatever accretion and accumulations have resulted from employment of his money and that of the other stockholders in the business of the company, still remains the property of the company, and subject to business risks which may result in wiping out the entire investment. Having regard to the very truth of the matter, to substance, and not to form, he has received nothing that answers the definition of income within the meaning of the Sixteenth Amendment."

[2] In the suit at bar, the learned counsel for the government urged upon the court the necessity of observing the form, not in so many words, but by their brief filed. They insist that the dividend was a cash dividend, because the resolution of the board so stated. By implication, therefore, they would place the defendant in the position of having the right to use the check of the corporation, which as a matter of fact, never came into his hands, and which, as a matter of fact must have been drawn against "no funds," notwithstanding his agreement with his associates and with T. Mellon & Sons, and notwithstanding the important fact that without such agreements the resolution of the board would never have been passed. That the board would never have passed such resolution, if there had been no such agreement, seems clear, not only from the testimony of the witnesses to that effect, but from other facts which appear in evidence, as, for instance, the absence of sufficient money and the limited credit possessed by the corporation, whose obligations to banks were given high standing by the indorsement of some of the very men who entered into the said agreement. In every aspect of this case, the defendant was not in the

position where he was merely entitled to carry out his agreement, but he was bound to do so. The dividend in question seems to be a final step in a series of transactions having for their object the refinancing of the corporation, and was based upon earnings and accumulations by subsidiary companies through a period of years.

Indeed, the evidence in this case discloses much which was before the courts in Gulf Oil Corporation v. Lewellyn, supra, and in the light of that case it is properly concluded that the surplus which was dealt with by the action of the Gulf Oil Corporation here involved was capital of that corporation before the beginning of the year 1913. The dividend in question was not an ordinary dividend to an ordinary stockholder, but was extraordinary, both in respect to the nature and the character of the transaction.

Further elaboration of the views of this court would be of no great value. Judgment must be entered in favor of the defendant.